WOODMEN OF THE WORLD *v.* BROWN.

4-4678

Opinion delivered June 14, 1937.

*Donham & Fulk, Fred A. Donham, Pat Mehaffy* and *Milton McLees,* for appellant.

*H. A. Tucker, Kenneth C. Coffelt* and *Wm. J. Kirby,* for appellee.

GRIFFIN SMITH, C. J. Two beneficiary certificates for $1,000 each were issued by appellant on the life of Homer C. Ford. The first was dated June 19, 1934, and was payable to the assured's four minor children. The second certificate was dated May 31, 1935, and named Ethel Brown, sister of the assured, as beneficiary. Ford died January 9, 1936, and the appellant, T. E. Nethercutt, qualified as guardian and brought suit on certificate No. TE-1202152. Ethel Brown, in her own rights, sued on certificate No. TE-1288782. The causes were consolidated and a jury returned verdicts for the face value of each certificate, upon which the court gave judgment.

Appellant defended upon the ground that Ford had falsely stated in each application that he had not, within five years preceding, suffered any mental or bodily disease or infirmity, and had not, within five years, consulted or been attended by a physician for any disease or injury, nor undergone any surgical operation. It is admitted that the questions were asked, and in each case the response was "No." Appellees do not seriously contend that the answers are not warranties, but insist that the evidence is conflicting as to the time the assured was treated or had consulted a physician, and that in view of this conflict the jury's verdicts should not be disturbed.

Appellant relies principally upon the testimony of Dr. J. P. Randolph, who on direct examination testified that, as well as he could remember, he first treated Homer C. Ford for pellagra and neuritis in 1933 or 1934. This statement appears at page 36 of the transcript, and the inference may be drawn from the record that Dr. Randolph was shown a letter, presumably written by him, or to him, in which reference was made to the doctor's first treatment or examination of Ford,

for the witness said: "From the letter that you showed me I evidently had some data to state it was July, 1934. Possibly I could or would not have stated it was in July unless I had some data at that time. If I put it down as July I had something to go by."

And then, on cross-examination, there is this testimony: Question: "I believe you said you were unable to say whether or not it was in July, 1933, or July, 1934?" Answer: "Yes, sir." Question: "As a matter of fact, Doctor, it could have been in 1935?" Answer: "Yes, sir, might have been in 1935." Question: "You are just testifying from memory?" Answer: "Yes, sir, with the exception there of the letter they have which states July, 1934. I figure I must have had some data to put down the month at least."

On redirect examination this testimony appears: Question: "Doctor, you don't mean to state that your first treatment of pellagra for him could have been last year, in 1935?" Answer: "No, not the first."

The witness then stated that it was his opinion the treatments were in 1933 or 1934, but that he did not know whether he treated Ford in 1935.

The effect of this testimony is that Doctor Randolph treated Ford in 1933 or 1934, and that he may have treated him as late as 1935, but if treatments were given in 1935 they were not the first.

Dr. F. J. Burgess, whose deposition was read in evidence, said that Homer C. Ford came to him and "wanted me to pass on the other fellow's opinion." Dr. Burgess then stated that it was considered unprofessional for one physician to pass judgment upon the diagnosis made by another physician, and he declined to advise or inform Ford, except to say that the symptoms were suggestive of pellagra. "At that time Ford's hands were rough and inflamed like pellagra, but he was up and going. This visit must have occurred two years before he died, or three." Question: "You are positive it was not just this last year?" "Oh, sure—it was not in 1935, because he died in 1936, and I know it must have been two years." On cross-examination Doctor Burgess testified that Ford told him he had been pro-

nounced "pellagran." "He showed me his hands and I told him it looked like it. That was some time after his wife's death." (It was brought out in evidence that Ford's wife died October 30, 1933.)

Miss Pearl Cole testified that she lived half a mile from Ford. "After his wife died I saw him with a breaking-out—kinda dark-looking spots on his hands and arms. Homer didn't mention the name of the disease, but said he was being treated for it by Dr. Randolph at Hot Springs."

In his deposition, read in evidence, Dr. A. H. Tribble testified that he operated on Homer C. Ford for appendicitis on February 20, 1930.

It will be observed that, while Dr. Randolph was not certain that he did not treat Ford in 1935, he was positive such treatment was not the first, and the letter referred to fixed the time as of July, 1934. Dr. Burgess testified that Ford came to him after his wife died in October, 1930, and told him that he had been examined, and that the diagnosis was pellagra, and added that he knew "this must have been two years ago, maybe three."

Miss Pearl Cole's testimony serves to confirm the date, Ford having stated that he was being treated by Dr. Randolph at Hot Springs.

Against the professional testimony offered and the testimony of Miss Cole and other lay-witnesses for appellant were appellees' witnesses, one of whom—Dr. S. R. Crawford—was a physician. Dr. Crawford testified that he knew Ford; saw him three to five times a year, but had never attended him or his family as a physician. Witness had gone hunting and fishing and "had stopped there." He said that Ford "appeared to be in good health, and did not complain."

Walter Paul, who took Ford's application for membership in the Woodmen of the World, said he thought Ford was in good health when the application was taken, but didn't know whether Ford had been treated by a physician, or whether he had pellagra.

William Martindale, financial secretary of appellant's Camp No. 42, testified that he delivered the certificates to Ford. "When I delivered the first one he

was walking in the field; I judge he was plowing. When I delivered the second one he was standing on the porch. In neither instance did I observe anything to lead me to believe he was in bad health."

Testimony given by other witnesses for appellees was to the effect that they had frequently seen Ford; that he appeared to be in good health; that they did not observe anything wrong with his hands or arms, and that he continued to work and care for a farm.

Proof of death and certificate by the attending physician, Dr. Randolph, were forwarded to appellant on January 22, 1936. The certificate recited that Ford's death was caused by lobar pneumonia. Question No. 2 was: "Did you treat or advise deceased prior to his last illness? If so, when, how long, and for what did you treat him?" Answer: "Neuritis and pellagra; six months."

Several days prior to his death, Ford was taken to State Hospital at Little Rock. A sister of the deceased testified that Ford had developed pneumonia. She said Dr. Randolph advised that the patient be taken to State Hospital. Appellant sought through cross-examination to show that Ford's mind had weakened as a result of pellagra, and that because of this he was brought to the hospital in Little Rock. The evidence on this point is not satisfactory, although physicians for appellant testified that insanity was a natural consequence of pellagra.

There is no evidence in the record, other than testimony of a negative character, to dispute Dr. Randolph's diagnosis of pellagra, a finding concurred in by Dr. Burgess. The positive diagnosis made by Dr. Randolph, and the time when treatments were given, are contradicted only by statements of witnesses who testified from appearances. With the exception of Dr. Crawford, none of these witnesses had professional knowledge, and Dr. Crawford merely says that Ford did not complain to him, or have objective symptoms.

Therefore, as a matter of law, it must be said that Dr. Randolph's testimony was not contradicted by anyone who professed to have knowledge of medical facts.

John T. Yates, appellant's secretary, testified that the beneficiary certificates would not have been issued if correct information had been given.

The applications contained this provision: "I hereby certify, agree and warrant, that all of the statements, representations, and answers in this application * * * are full, complete and true [and] shall be warranties, and I agree that any untrue statements or answers made by me in the application, or to the examining physician, or any concealment of facts in this application or to the examining physician, intentional or otherwise * * * shall make my beneficiary certificate void."

There was the further provision that the application, the constitution, and the by-laws of the Association should constitute the basis for and form a part of the beneficiary certificate.

In *Commonwealth Life Ins. Co.* v. *Tanner,* 175 Ark. 482, 300 S. W. 927, this court said: "Warranties as to the health and physical condition of the insured, both at the time of the application for the insurance, and certainly at the time of the delivery of the policy, were false, relieving the insurance company from any liability under the policy on that account, in accordance with its terms."

In *Brotherhood of American Yoemen* v. *Fordham,* 120 Ark. 605, 180 S. W. 206, we said: "One question asked by the defendant association was whether or not the insured had consulted or been examined by a physician within the last ten years. To that question he answered 'No.' His answer was false; and, according to the terms of the policy, was warranted to be true. The answers in question were made in regard to matters which were material to the risk, and did not relate to matters of opinion or judgment about which there might have been an honest mistake on the part of the applicant."

In *Springfield Life Insurance Co.* v. *Slaughter,* 183 Ark. 692, 38 S. W. (2d) 13, the application contained the following stipulation: "I further agree that if it should develop that I have misrepresented any material fact covered by the interrogatories or failed to make full dis-

closures of any material fact, the policy shall be null and void." In the opinion in that case it was said: "The undisputed testimony discloses that the insured was in bad health and had been for a long time when he applied for the policy. He was suffering from dropsy at the time he made the application and died therefrom within two months after the policy was delivered to him. Based upon these facts the trial court should have granted appellant's request for an instructed verdict and dismissed appellee's complaint."

The distinctions between warranties and representations, and their effects upon policies of insurance and beneficiary certificates, have been frequently discussed in decisions of this court, and it is unnecessary to repeat them here.

It is sufficient to say that the record in the instant case discloses that which is a matter of common knowledge—pellagra is a serious disease or malady, frequently resulting in death or insanity, or both; its manifestations or objective symptoms are not constant, but recur ordinarily with seasonal changes, and except in advanced stages physicians experience difficulty in correctly diagnosing the disease unless aided by the patient's history.

Appellant had a right, before issuing the beneficiary certificates, to ask, as it did, whether the applicant had been examined by any physician, and appellant was entitled to truthful answers. Ford knew that he had been treated within five years, and with respect to certificate No. 1202152 he knew that, within such time, he had been operated upon for appendicitis. It may be argued that the operation did not contribute even remotely to the assured's death; yet, the fact of the operation cannot be denied, and appellant had a right to expect a correct answer. But it was of much greater importance to have responsive answers to the other questions, and when the applicant declared that he had not consulted or been treated by a physician within five years, and warranted these answers to be true, he either fraudulently or negligently deceived appellant. The penalty for false answers was agreed upon by the parties—the certificates

should be void. Courts cannot relieve the assured's beneficiaries, innocent though they may be, of the natural consequences of a contract founded on deception.

Under certificate No. TE-1288782, on which Ethel Brown brought suit, $11.19 had been paid in premiums. Under certificate No. TE-1203152, on which Nethercutt as guardian brought suit, $18.41 had been paid in premiums. These amounts were tendered before the complaints were filed, and judgment is here given for such items.

In all other respects the judgments are reversed, and the causes dismissed.